UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNA ANGIE LEUNG,                                    :

                    Plaintiff,                      :          17 Civ. 2703 (LTS) (AJP)

            -against-                               :          **REPORT & RECOMMENDATION**

NANCY A. BERRYHILL,                                 :
Acting Commissioner of Social Security,
                                                    :
                    Defendant.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Laura Taylor Swain, United States District Judge:**

          Pro se plaintiff Una Leung brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI").  (Dkt. No. 2: Compl.)  Presently before the Court is the Commissioner's

motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. Nos. 11 & 15:

Comm'r Notice of Mot.)  Leung did not respond and the time to do so has passed.  (See Dkt. No. 6:

Scheduling Order.)

          For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. Nos. 11 & 15) should be GRANTED.

## FACTS

### Procedural Background

          Leung filed for benefits on October 15, 2013, alleging a disability onset date of June

30, 2008.  (Dkt. No. 10: Administrative Record ("R.") 175-88.)  On June 5, 2015, represented by

counsel, Leung had a hearing before Administrative Law Judge ("ALJ") Mark Solomon (R. 58-93), who denied Leung's benefits application on June 23, 2015 (R. 16-32). ALJ Solomon's decision became the Commissioner's final decision when the Appeals Council denied review on February 27, 2017. (R. 2-4.)

## Non-Medical Evidence and Testimony

Born on June 1, 1969, Leung was thirty-nine years old at the alleged June 30, 2008 onset of her disability. (R. 63, 176.) Leung testified that she completed "[s]ome college" and since February 2015, has worked eight hours per week at Lower Eastside Harm Reduction, "navigat[ing] a Hep C client to go for testing result[s] and treatment into Mount Sinai Hospital." (R. 63-64.) Leung previously worked in 2002 as an office manager assistant; in 2003 as a grant specialist and "problem solver"; and from 2006 through June 2008 as an administrative assistant and "rate retention specialist." (R. 64-65, 84-86.)

Leung testified that she is able to travel alone using public transportation, and did not require "the use of a cane or any other type of assistive device to help [her] walk," although she could not walk for long. (R. 66.) Leung has a driver's license, but has not driven a car "in over 13 years due to anxiety and memory loss." (R. 219.) Leung lives with her mother and children, ages seventeen and twenty (R. 66), and has a boyfriend of six months who she sees twice a week (R. 73). Leung testified that she is a drug and alcohol "recovery coach" and talks on the phone to those in need "[l]ike two or three times a day." (R. 68-69.)[1] Leung also attends a church discussion group every Tuesday. (R. 70.) Leung's November 12, 2013 function report states that she "spends time with her peers at various programs she attends, and also spends time with her mother and daughters"

---

[1] Although Leung formerly used drugs, she was "almost four years clean" at the time of the hearing. (R. 70.)

"almost every day." (R. 221.) However, Leung stated that she "gets paranoid in large crowds of people and suffers from social anxiety" (id.), but has no problem getting along with authority figures and has not lost a job because of problems getting along with others (R. 223).

In her function report, Leung described her daily activities as: "wake up, takes prescribed medication, attend programs and local groups, reads and watch TV." (R. 217.) Specifically, Leung reads "mystery and romance books . . . [and] watch[es] TV" "every day." (R. 220.) Leung testified that she is able to care for her own personal needs, e.g., dress, bathe and groom herself on a daily basis. (R. 66.)[2] Leung also does the laundry and cooks at home, but "cannot do a lot of shopping because [she has] memory loss" due to two mini-strokes and "a couple of epilepsy and blackouts." (R. 66-67.)[3] Leung testified that these incidents triggered memory loss and confusion, causing her, for example, to "put milk in the cabinet and put sugar in the refrigerator." (R. 67, 76.) Leung can pay bills, count change and handle a savings account, but her memory loss causes her to forget how much money she has. (R. 220.) Leung can follow written and spoken instructions, if "repeated more than once." (R. 223.)

Leung stated that she is unable to work full time because of her "[f]orgetfulness and sometime[s] [her] anxiety is just too high." (R. 76-77.) Leung's medications help her sleep and allow her to "function . . . without people thinking [she is] crazy," with no side effects that she could recall. (R. 82.) However, Leung has trouble concentrating and forgets to take her medications

---

[2]    This testimony varies from Leung's function report in which she stated that she "dresses with no knowledge of colors or coordination . . . [and her] clothes often don't match and are wrinkled." (R. 217.) Leung further wrote that she "has to be reminded to take a bath/shower by [her] mother or daughter," and "forgets to wash hair unless reminded by [her] mother or daughters." (Id.)

[3]    Leung's function report states that she "is unable to prepare meals unsupervised due to bad memory." (R. 218.)

"[s]ometimes two times a week." (Id.) When not on her medication, Leung "see[s] shadows" but "not as often as before." (R. 83.)

Leung testified that she has had back pain since 1983 when she had her first child. (R. 78.) Leung claimed that she can sit for approximately forty-five minutes before having to stand due to pain, stand for thirty-five minutes, and walk for twenty to forty-five minutes before her left knee starts to hurt. (R. 74-75.) Leung stated that she had back/neck surgery and is "in less[] pain" as a result, "but if [she] sleep[s] wrong, . . . sit[s] wrong, or if [she] walk[s] a long distance, [she] start[s] feeling it." (R. 80.) Leung has no problems with her hands or fingers. (R. 75.) Leung's function report further states that she "cannot kneel due to two injured knees," would "not be able to stand up if she squatted," and has "difficulty climbing stairs." (R. 222.)

Vocational expert Yaakov Taitz, Ph.D., testified at the hearing before ALJ Solomon. (R. 87.) ALJ Solomon posed several hypothetical questions to Dr. Taitz, the first of which asked him to "assume . . . [Leung] has the ability to perform work related mental and physical activities subject to the following exertional and non-exertional limitations":

> Assume [Leung] could do the full range of light work. She would have to avoid climbing ro[p]es, ladders, and scaffolds. She would have to avoid concentrated exposure to respiratory irritants. She would have to avoid work at unprotected heights with hazardous machinery. She could remember, understand, and carry out simple instructions, make simple work related decisions, maintain attention and concentration for work, and could do a low stress job, again, requiring only simple decision making and not requiring fast pace, high volume, assembly line production quotas.

(R. 90.) Dr. Taitz testified that, assuming the foregoing, Leung would not be able to perform her past work. (Id.) ALJ Solomon next asked Dr. Taitz to "[a]ssume a hypothetical Claimant with [Leung's] age, education, and work experience . . . [who] would have the ability to perform related mental and physical activities as [ALJ Solomon] described in [his] first hypothetical." (Id.) Dr.

Taitz testified that there would be some light exertion "Level 1 or 2 jobs that [Leung] could perform," including mail clerk, price marker and information clerk, all of which exist in significant numbers in the national economy.  (R. 90-91.)

ALJ Solomon further asked whether several other hypothetical limitations would impact the jobs that Leung could perform, specifically that Leung: (1) "would be unable to maintain a regular schedule"; (2) "would be expected to miss more than one day of work per month"; (3) "would be unable to maintain attention and concentration for even simple, repetitive work"; and (4) "would be off task more than 10% of the time."  (R. 91.)  Dr. Taitz testified that each of these limitations, respectively, if combined with the limitations in ALJ Solomon's first hypothetical, would eliminate any jobs that Leung could perform.  (Id.)

**Medical Evidence Before the ALJ**

### Psychiatric Impairments

#### St. Mark's Place Institute For Mental Health

On September 25, 2006, Marina Litvinava, MSW, wrote a note to "HRA" stating that Leung had been in weekly treatment at St. Mark's Place Institute for Mental Health since September 5, 2006 for individual psychotherapy and medication management.  (R. 269.)  Litvinava stated that Leung had been diagnosed with ADHD and bipolar disorder.  (Id.)  In a separate note, Litvinava wrote that Leung attended psychotherapy "to deal with her frustration, anxiety attack[s], [and] irritability."  (R. 270.)

On February 19, 2007, Dr. Veesha Tomashevsky wrote a "To Whom It May Concern" letter stating that Leung had treated with Dr. Tomashevsky for the last six months and that "she is still not stable enough to return to work."  (R. 266.)

**Bellevue Hospital Center**

On July 3, 2011, Leung was hospitalized after attempting suicide by ingesting fifty Benadryl pills. (R. 276.) Leung had a history of depression and crack cocaine abuse, and felt "very frustrated and emotional" and "wanted to hurt herself." (Id.) Leung's mother "report[ed] feeling scared of [Leung] as [Leung] called her mother from the hospital and said that she would kill her mother and daughters when she was discharged." (R. 279.) Leung's mother further stated that Leung had "frequently threaten[ed] to kill herself . . . unless her family gives her money for drugs." (Id.)

On October 6, 2011, Leung was admitted to Bellevue Hospital (R. 310) for "[a]cute alcohol intoxication" (R. 313). Leung was hospitalized at Bellevue Hospital from October 9, 2011 through November 7, 2011 due to bipolar disorder, a manic episode and cocaine dependence. (R. 512-88, 605.)

**New York Downtown Hospital**

On September 11, 2011, Leung was "found unresponsive on the street with pinpoint pupil[]s" following a drug overdose and was admitted to New York Downtown Hospital. (R. 298-99.) Leung took "almost [a] full bottle of naproxen and around 9 pills of [S]eroquel" during an argument with her family. (R. 303.) The attending physician noted that Leung had a history of cocaine abuse and "as per family mom does this often." (R. 301.)

**Dr. Andrew Chan**

On September 9, 2011, Leung saw Dr. Andrew Chan for her bipolar mood disorder, extreme mood swings, frustration, racing thoughts and insomnia. (R. 397.) Leung was oriented "x3," but her memory, judgment and impulse control were diminished. (R. 400.) On September 18, 2011, Dr. Chan wrote that Leung's mood was less irritable, but her speech was pressured and she

had manic symptoms. (R. 401.) He opined that "[b]ecause of the severity of [Leung's] illness, [Leung] require[d] long term treatment." (Id.) On September 24, 2011, Dr. Chan wrote that Leung's mood was less irritable, she had less racing thoughts, and usually could sleep through the night. (R. 402.) On October 1, 2011, Dr. Chan wrote that Leung's mood was less irritable, and she "could sleep through the night but could not control abusing cocaine." (Id.) On October 8, 2011, Dr. Chan again wrote that Leung's mood was less irritable and she could sleep at night, but was "anxious in the day time." (Id.)

On November 30, 2011, Dr. Chan wrote that Leung had average intelligence, denied auditory hallucinations, had less racing thoughts, her memory and concentration were good, her impulse control was "still poor," and she was not suicidal or homicidal. (Id.) On December 4, 2011, Dr. Chan wrote that Leung's "mood [was] less labile [and] less irritable," and she had "no pressure of speech." (R. 403.) On December 8, 15 and 22, 2011, Dr. Chan wrote that Leung's mood was less labile/anxious, she had less racing thoughts and "could sleep at night." (Id.) On December 26 and 28, 2011, Dr. Chan wrote that Leung's mood was less labile, her "hallucinations [were] under control," and she had "no active delusional thinking." (R. 404.)

From 2012 through 2014, albeit with some fluctuation in the severity of Leung's symptoms, many of Dr. Chan's nearly one hundred treatment notes state that Leung's mood was less labile/irritable/depressed, Leung had less racing thoughts and could sleep at night. (See R. 404-24, 612-14.) From January 2015 through May 2015, Leung presented more often with an irritable and/or anxious mood, accompanied at times by pressured speech and racing thoughts. (R. 614-15.)

On July 25, 2014, Dr. Chan completed a mental medical source questionnaire. (R. 606-08.) Dr. Chan opined that Leung had no or mild limitations in her ability to relate to others, restrictions of daily activities, deterioration of personal habits, ability to sustain a routine without

special supervision, ability to perform activities within a schedule, maintain regular attendance, be punctual, understand and carry out instructions, use good judgment at work, perform simple tasks, behave in an emotionally stable manner, and respond appropriately to supervision, coworkers, usual work pressures and changes in the work setting.  (R. 606-07.)  Leung had moderate limitations in her ability to maintain concentration, pace and attention for at least two hours at a time, and perform complex, repetitive or varied tasks.  (Id.)

Dr. Chan opined that Leung would be absent from work one to two days per month due to her impairments and/or treatment, but that her condition was not likely to deteriorate if she experienced job stress.  (R. 607.)  In Dr. Chan's opinion, Leung had not sustained any permanent damage due to her drug use, which was no longer a factor in her mental condition given her sobriety, and there were no medication side effects that would impact Leung's ability to work.  (R. 607-08.)  Dr. Chan concluded that Leung's limitations had not lasted, nor could they be expected to last, twelve consecutive months or longer, and Leung could "function well if [she] remain[ed] sober." (Id.)

**Healthcare Associates In Medicine, P.C.**

On April 5, 2013, Leung was seen by Florence Shum, D.O., for an initial evaluation. (R. 386-88.)  Leung reported that she formerly was addicted to drugs and alcohol, but had been sober for over a year.  (R. 386.)  Leung's chief complaint was a memory deficit; she stated that she often forgot where she put her belongings, was not able to concentrate when reading, and had difficulty retaining information.  (Id.)  Leung was "neat and well groomed," "awake, alert and oriented to person, place, and time," was able to follow "3-step commands," had fluent speech, normal naming and repetition, and normal reading and writing.  (R. 387.)  Leung was well-developed and in no apparent distress, her neck was supple with good range of motion, there was

normal tone, bulk and "5/5" power in all of her extremities, normal gait, and her heel/toe walk was normal. (R. 387-88.) Dr. Shum opined that Leung suffered from "toxic encephalopathy, likely related to previous drug use." (R. 388.) Dr. Shum recommended a brain MRI and a neuropsychological evaluation. (Id.)

On October 18, 2013, Dr. Shum wrote that Leung's brain MRI "revealed a few isolated punctate foci," likely caused by cocaine use. (R. 379; see R. 497.) Leung was "fully oriented, coherent, . . . lucid" and was able to "follow three-step commands." (R. 380.) Dr. Shum recommended that Leung start cognitive behavioral psychotherapy along with prescription medication to assist with her anxiety and sleep issues. (Id.)

On December 20, 2013, Leung reported occasional headaches and insomnia. (R. 376.) Leung stated that her medication helped reduce her anxiety and improved her sleep; Dr. Shum again recommended that Leung attend psychotherapy. (Id.)

**Christina Palmese, Ph.D.**

On September 3, 2013, Leung underwent a neuropsychological evaluation with Christina Palmese, Ph.D. "to address concerns of a 2 year history of progressive cognitive difficulties." (R. 340-43.) Leung complained of progressive memory loss, poor multi-tasking, disorganization, "[l]ifelong attention problems and impulsivity," and problems completing activities of daily living due to her cognitive issues. (R. 340.) Leung was adequately oriented and neatly groomed, had good awareness, mild inattention, and normal mood and affect. (R. 341.)

Dr. Palmese wrote that Leung's "mild inattention . . . and mild executive dysfunction . . . appear[ed] to be affecting her learning," i.e., Leung "is a slow learner who needs extra time to encode, organize, and process new information." (R. 342.) Dr. Palmese stated that Leung more easily "learned and recalled information that was presented in context versus rote-list format such

as a mental 'to do' list." (Id.) "Nonetheless," Dr. Palmese wrote, "she adequately retained the information that she learned, and there was no evidence of a primary memory disorder." (Id.)

Dr. Palmese concluded that "the primary cause of [Leung's] progressive cognitive decline cannot be determined at this time," and could be attributed to a number of factors, including Leung's thirty-year history of drug use, current levels of emotional stress, potential medication side effects, and/or "the effects of mild microvascular ischemia." (R. 342-43.) It also was possible, however, that Leung was "subjectively experiencing progressive cognitive decrement in the absence of true deterioration," given that she was no longer using drugs to "self-medicat[e] her underlying ADHD symptoms . . . and she may not otherwise possess adequate cognitive strategies to help her compensate for longstanding and potentially stable cognitive weaknesses." (R. 343.) Dr. Palmese wrote that Leung likely would have difficulty learning new lecture material if she returned to school, even if provided with special accommodations, although "her cognitive weaknesses alone would not render her wholly unable to work." (Id.) Rather, Leung "would likely succeed in a position in a relatively slow-paced environment that offers rote and potentially hands-on learning with limited multi-tasking and rapid decision-making requirements." (Id.)

Dr. Palmese recommended that Leung (1) attend weekly individual psychotherapy; (2) obtain another brain MRI to monitor ischemic changes; (3) review Topomax medication with her physician, which could contribute to her inattention; and (4) consider keeping written lists and reminders to help better remember things. (Id.)

**Michael Kushner, Ph.D.**

On November 20, 2013, Michael Kushner, Ph.D., of Industrial Medicine Associates psychologically evaluated Leung. (R. 361-65.) Leung reported difficulty falling asleep and occasional depressive moods, "but [did] not feel that they [we]re serious." (R. 362.) Leung had no

suicidal thoughts or panic attacks, but reported "a great deal of anxiety," frequent restlessness, memory issues and difficulty concentrating.  (Id.)  Leung further stated that her bipolar disorder made her mood fluctuate and she occasionally "ha[d] hallucinations of shadows of a person."  (Id.) Leung stated that she stopped using alcohol and drugs in 2011.  (Id.)

Leung's demeanor and responsiveness to questions were cooperative, but her "[m]anner of relating, social skills, and overall presentation were poor.  Specifically, [Leung] presented as highly anxious." (R. 363.)  Leung appeared restless, "disheveled[] and unkempt" with poor grooming and hygiene, had fair eye contact, her speech intelligibility was somewhat impaired, and her thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in [the] evaluation setting."  (Id.)  Leung was anxious, had a euthymic mood and clear sensorium, and her orientation was "[c]lear x3." (Id.)  Leung's attention and concentration were "[g]enerally intact," her recent and remote memory skills were impaired, her cognitive functioning was somewhat below average, her insight was limited and her judgment was fair.  (R. 363-64.)

Leung reported that she dressed, bathed and groomed herself daily, did some household chores, used public transportation and socialized with people in her drug treatment program.  (R. 364.)  Leung stated "that her family relationships [were] good and that she spen[t] her days going to . . . drug treatment program activities five days a week for a varying number of hours." (Id.)

Based on his examination, Dr. Kushner opined that there was no evidence of a limitation or mild limitation in Leung's ability to follow and understand simple directions and instructions, and perform simple tasks independently.  (Id.)  However, Leung had a moderate to marked limitation in her ability to maintain attention, concentration and a regular schedule, learn

new tasks, perform complex tasks under supervision, make appropriate decisions, relate adequately with others and appropriately deal with stress.  (Id.)  These difficulties, Dr. Kushner opined, were "caused by [Leung's] psychiatric problems."  (Id.)  Dr. Kushner further wrote that the evaluation results "appear[ed] to be consistent with psychiatric problems . . . [that] may significantly interfere with [Leung's] ability to function on a daily basis."  (Id.)  Dr. Kushner recommended that Leung continue with her current drug and psychological treatment, and stated that Leung's prognosis was guarded given her symptoms.  (R. 365.)

### Dr. Ling Cheng

On March 11, 2015, Leung presented to Dr. Ling Cheng with complaints of memory loss and a "big gap in her memory."  (R. 699.)  Leung claimed that she was "unable to recall people she used to know," could not "remember things [that] occurred two days ago," and had concentration problems due to her bipolar disorder and ADHD.  (Id.)  Leung was "[a]wake, alert, and oriented to time, place and person"; her speech was clear; her short term memory was "3/3"; and she had an appropriate fund of knowledge with normal comprehension.  (R. 700.)  Leung's strength was "5/5" throughout, and her muscle tone, sensory examination, fine movements, coordination and gait were normal.  (Id.)  Dr. Cheng diagnosed Leung with memory loss without specifying further.  (Id.)

### Dr. Alejo Parellada

On April 21, 2015, Dr. Alejo Parellada wrote a "To Whom It May Concern" letter stating that he had been "Leung's psychiatrist since 2006."  (R. 609.)  Dr. Parellada wrote that Leung was diagnosed with bipolar disorder, generalized anxiety disorder, attention deficit disorder and cocaine dependence in remission, and that she was "four years drug free."  (Id.)  Dr. Parellada opined that, while Leung's condition was stable, she was "unable to keep a full time competitive job" due to her "poor impulse control, memory problems and irritability."  (Id.)

### E. Kamin, Ph.D.

Psychological consultant Dr. Kamin reviewed some of Leung's medical records and opined that she had mild difficulties in activities of daily living and maintaining social functioning, and moderate difficulties maintaining concentration, persistence and pace.  (R. 101-12.)

### Physical Impairments

### Victoria Physical Medicine, P.C.

On May 25, 2012, Leung presented to Dr. Victoria Zhang with lower back pain, cervical pain and arthritis radiating to her legs and rated an eight out of ten on a pain scale.  (R. 345.)  Dr. Zhang wrote that Leung "failed pain medicine treatment."  (Id.)  Leung could ambulate independently and perform activities of daily living, had a normal gait and station, normal reflexes, impaired sensation, and full range of motion in her upper and lower extremities.  (Id.)  Dr. Zhang diagnosed Leung with lower back pain, lumbar radiculopathy and cervical radiculopathy, and ordered an x-ray of Leung's cervical and lumbar spine.  (R. 346.)

Leung received the results of her cervical and lumbosacral spine MRI on June 1, 2012.  (R. 347.)  The cervical spine images revealed unremarkable vertebral body heights with no fracture, "[m]ild kyphotic curvature of the upper cervical spine," "[d]egenerative disc disease at C5-6 and C6-7 with productive prominent osteophytes," "[s]ignificant hypertrophy" at the facet joints, "[m]oderate to severe narrowing at C5-6 and C6-7," "[m]arked narrowing at C3-4 and C4-5[,] mild narrowing at C5-6 [and] moderate narrowing at C6-7."  (Id.)  Leung's lumbosacral spine showed normal vertebral body heights, normal disc spaces with "[v]ery tiny spurring" at some vertebrae, and unremarkable facet and sacroiliac joints.  (Id.)  The imaging physician diagnosed Leung with degenerative disc disease at C5-6 and C6-7, marked cervical spine facet joint degenerative arthropathy and hypertrophy, significant bilateral neural foraminal narrowing due to

degenerative changes, and a tiny marginal spurring at the edges of some lumbar spine vertebrae. (Id.)

On the same date, June 1, 2012, Leung obtained the results of a bilateral knee MRI that revealed mild degenerative changes, greater in the right knee than the left.  (R. 348.)

On May 29, 2012, June 15, 2012, June 26, 2012, August 17, 2012, August 20, 2012, July 9, 2013, November 5, 2013 and July 23, 2013, Leung treated with various physical therapists and Dr. Zhang, and complained of back and/or neck pain radiating to her legs that she rated between five and seven on the pain scale.  (R. 349-51, 354-55.)  On October 1, 2012, Dr. Zhang wrote that Leung rated her pain an eight out of ten.  (R. 352.)  Leung had normal gait, impaired sensation and decreased reflexes.  (Id.)  On June 3 and October 18, 2013, Leung rated her pain between seven and ten, and had an antalgic gait, cervical or lumbar spine tenderness, and impaired sensation and reflexes.  (R. 353, 358.)

On July 23, 2013, Dr. Zhang completed a consultation report on Leung's treatment. (R. 356-57.)  Dr. Zhang wrote that Leung presented with worsening neck pain that radiated to her upper extremities with numbness and tingling in her arms and hands.  (R. 356.)  An electrodiagnostic study was "abnormal" and revealed "evidence of left mild and moderate right C6 cervical radiculopathy."  (R. 357.)  Dr. Zhang wrote that a "[c]linical correlation [was] suggested for cervical disc herniation and cervical spondylosis."  (Id.)  Dr. Zhang recommended treatment with anti-inflammatory medication, muscle relaxants, an assistive device and physical therapy; she further recommended a cervical spine MRI if the foregoing treatment failed.  (Id.)

**Dr. Aurelio Salon**

On November 20, 2013, Leung had an internal medicine consultation with Dr. Aurelio Salon of Industrial Medicine Associates.  (R. 366-70.)  Leung stated that she could "cook,

clean, do laundry, shop, shower, bathe, and dress by herself," and also "watches the TV, reads, and socializes with friends." (R. 367.) Leung's cervical and lumbar spine showed full flexion, extension, and rotary movement bilaterally, and her thoracic spine had no scoliosis, kyphosis or abnormality. (R. 368.) Moreover, Leung's straight leg raise test was negative bilaterally; she had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally; and full range of motion in her hips, knees and ankles bilaterally. (Id.)

Leung's strength was "5/5 in the upper and lower extremities," with no cyanosis, clubbing, edema or muscle atrophy, and her hand and finger dexterity was intact with "5/5" bilateral grip strength. (Id.) A November 22, 2013 x-ray of Leung's right knee showed "[e]arly degenerative changes." (Id.; see also R. 371.) Leung appeared obese but in no acute distress with a normal gait, could walk on heels and toes without difficulty and fully squat, had a normal stance, used no assistive devices, needed no help changing or getting on and off of the examination table, and was able to rise from her chair without difficulty. (R. 369.)

Based on his examination, Dr. Salon opined that there were "no objective findings to support the fact that [Leung] would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects." (R. 370.) However, given Leung's history of asthma, she "should avoid smoke, dust, and other known respiratory irritants." (Id.)

**Healthcare Associates In Medicine, P.C.**

On March 7, 2014, Leung saw Dr. Shum and reported numbness and severe pain radiating down her right arm, but she denied any neck pain. (R. 372.) Leung was well-developed, in no apparent distress, her neck was supple with a mild restriction in range of motion, she had no tenderness to palpation in her cervical paraspinals, strength was "5/5" in the upper extremities, and her fine finger movements and gait were normal. (R. 373.) Dr. Shum "recommended obtaining [an]

MRI of the cervical spine as well as EMG and nerve conduction studies of the upper extremities to evaluate for cervical radiculopathy and rule out carpal tunnel syndrome." (Id.) Dr. Shum also increased Leung's prescription medication dosage to assist with her pain and sleep issues. (Id.)

A March 13, 2014 MRI of Leung's cervical spine revealed a mild reversal of the normal lordosis and minimal grade retrolisthesis at C5-C6, but the vertebral body alignment and heights otherwise were within normal limits with no evidence of fracture. (R. 599.) Leung had a "[s]mall central focal disc herniation" and "severe left foraminal stenosis" at C3-C4, "severe left foraminal stenosis" at C4-C5, "[m]ild central canal stenosis" and "severe bilateral foraminal stenosis" at C5-C6, and "[r]ight central disc osteophyte complex indenting the ventral thecal sac" and "severe bilateral foraminal stenosis" at C6-C7. (Id.) Overall, the MRI showed marked degenerative changes in Leung's cervical spine. (Id.)

**Hudson Spine And Pain Medicine**

On May 23, 2014, Leung had an initial consultation at Hudson Spine and Pain Medicine where she complained of worsening low back and neck pain, radiating from her lower back to her right leg, and from her neck to her right arm. (R. 425.) Leung described the pain as constant and rated it an eight out of ten on a pain scale; the pain "interfere[d] with sitting, standing, walking, . . . stairs, lifting, [and] overhead activities," and improved with rest. (Id.)

On June 6, 2014, during a follow up appointment with Alexander Rances, D.O., Leung rated her pain a "6-7/10," and stated that it radiated from her neck into her shoulders bilaterally; Leung "[d]escribe[d] the pain as sharp, stiff, achy, tight and throbbing," made "worse with walking, lifting, grabbing, and overhead activities." (Id.) Leung had no joint swelling, stiffness or myalgias, and appeared well developed, well nourished and in no acute distress. (R. 425-26.) Leung had an antalgic gait, back tenderness over facet joints, trigger points, and tenderness and

spasms over her paraspinal muscles, but needed no assistive device. (R. 426.) Leung had limited range of motion in her cervical and lumbosacral spines accompanied by pain with movement, diminished strength in her upper and lower extremities, and a positive straight leg raise test on the right. (Id.)

Dr. Rances assessed the following symptoms: cervical and lumbosacral radiculopathy, cervical and lumbar disc displacement, and lumbosacral and neck sprains. (Id.) Dr. Rances further wrote that Leung "would be a good candidate for a series of lumbar and cervical epidural steroid injections" (id.), and administered Leung a cervical epidural steroid injection during the visit (R. 427). Dr. Rances noted that Leung experienced "over 50% improvement in pain and function" after the injection. (R. 425.)

On June 27, 2014, Leung received a second epidural injection and experienced a 60% improvement in her pain and function. (R. 428.) While Leung continued to complain of neck pain, it was less severe following the injections. (Id.) On July 11, 2014, Leung received another epidural injection and experienced an 80% improvement in her pain and function. (R. 432.) However, Leung complained of bilateral knee and low back pain rated a "7-8/10" that radiated from her low back to her right leg. (Id.) Leung stated that the pain was worse with sitting, walking, standing, kneeling, bending and flexing the knee. (Id.)

Leung continued receiving knee and lower back injections along with physical therapy from July 29, 2014 through May 20, 2015. (R. 436-96, 616-98.) These records generally document Leung's antalgic gait, back and neck tenderness, trigger points, limited cervical and lumbosacral range of motion, and pain with range of motion. (See generally id.) However, Leung's most recent records, from October 2, 2014 through May 20, 2015, also state that Leung appeared well developed, in no acute distress, used no assistive devices, had no diminished sensation, had full

motor strength in her upper and lower extremities bilaterally (with some exceptions) and intact reflexes, and had a negative straight leg raise test bilaterally. (R. 654-55, 657-58, 661-62, 664-65, 669-70, 672-73, 675-76, 679-80, 683-84, 687-88, 691-92, 695-96.)

On August 8, 2014, Leung underwent a lumbar spine MRI that showed normal vertebral body alignment and height, no evidence of fracture, and preserved disc space heights. (R. 498.) The MRI further revealed no disc herniation, central canal or foraminal stenosis, but did show bilateral facet arthropathy and ligamentum flavum thickening at L4-L5 and L5-S1. (Id.)

### New York Presbyterian Hospital

On April 8, 2015, Leung was admitted to the Emergency Department at New York Presbyterian Hospital for knee pain and was discharged the same day. (R. 710-11.)

### ALJ Solomon's Decision

On June 23, 2015, ALJ Solomon denied Leung's application for benefits. (R. 16-32.) ALJ Solomon applied the appropriate five step legal analysis. (R. 20-21.) First, he found that Leung "has not engaged in substantial gainful activity since June 30, 2008, the alleged onset date." (R. 21.) Second, ALJ Solomon found that Leung had "the following severe impairments: lumbar and cervical degenerative disc disease with cervical radiculopathy, bilateral knee degenerative joint disease, a history of asthma, obesity, a history of ADHD . . . , a history of substance abuse, and bipolar disorder." (Id.) Third, ALJ Solomon found that Leung did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," in particular Listing 12.04. (R. 21-22.) ALJ Solomon determined that Leung had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she

must avoid concentrated exposure to environmental irritants; must avoid climbing

ropes, ladders, or scaffolds; avoid working at unprotected heights or with hazardous machinery; can understand, remember and carry out simple instructions, make simple work-related decisions, maintain attention and concentration for rote work, maintain a regular schedule, and can perform a job defined as one with only simple decisionmaking and not requiring high volume, fast-paced assembly line production quotas.

(R. 23.)

ALJ Solomon noted that Leung was hospitalized multiple times in 2011 for a suicide attempt, drug overdoses, bipolar disorder, a manic episode and cocaine dependance. (R. 23-24.)

ALJ Solomon noted that Leung underwent a neuropsychological examination with Dr. Palmese, who recommended weekly psychotherapy and stated that Leung's "'cognitive weaknesses alone would not render her wholly unable to work.'" (R. 25; see page 10 above.) ALJ Solomon further noted that Dr. Palmese recommended a slow-paced work environment that involved limited multi-tasking or rapid decisionmaking. (R. 25.) ALJ Solomon gave Dr. Palmese's opinion "partial weight, as she [was] a one-time consultant" and "the limitations [Dr. Palmese] described are accommodated by the residual functional capacity, although [Leung's] long-term treating psychiatrist [Dr. Chan] opine[d] minimal limitations." (Id.)

ALJ Solomon discussed Dr. Salon's consultative internal medicine examination of Leung during which her "musculoskeletal examination was entirely normal . . . [,] the cervical, thoracic and lumbar spines all had full range of motion, straight leg raising was negative for pain, and [Leung] had full range of motion of the upper and lower extremities bilaterally." (Id.) ALJ Solomon noted that Dr. Salon concluded that there were no objective findings indicating Leung was restricted in her ability to sit, stand, climb, push, pull, or carry heavy objects. (R. 26.) ALJ Solomon gave Dr. Salon's opinion "partial weight" because it was "based on a one-time examination and [Leung] has diagnosed physical conditions which would limit her to light work; in addition," ALJ

Solomon wrote, "the record indicates that [Leung's] condition has worsened since this examination." (Id.)

ALJ Solomon discussed Dr. Kushner's consultative mental status examination at which Leung complained of restlessness, difficulty concentrating and memory problems. (Id.) ALJ Solomon noted that Dr. Kushner diagnosed Leung with bipolar disorder and anxiety disorder, and concluded that Leung had at most a mild limitation following and understanding simple directions and instructions and performing simple tasks independently, as well as moderate to marked limitations maintaining attention, concentration and a regular schedule and appropriately dealing with stress, among other limitations. (R. 27.) ALJ Solomon gave Dr. Kushner's opinion "little weight, as [Leung's] own description of her daily activities [wa]s actually greater than this assessment and [Leung's] long-term treating doctor [found] few limitations." (Id.)

ALJ Solomon discussed Leung's treatment and multiple epidural/knee injections at Hudson Spine and Pain Medicine with Dr. Rances and others. (Id.) ALJ Solomon wrote that Leung reported improvement following her injections, and numerous injections were documented through 2015. (Id.) ALJ Solomon further wrote that these records "document continued limitations in range of motion and an antalgic gait." (Id.)

ALJ Solomon discussed Dr. Chan's medical source statement that stated Leung had at most a mild impairment in her ability to relate to others, sustain a routine, maintain regular attendance and be punctual, and activities of daily living. (R. 28.) The remainder of Dr. Chan's findings, ALJ Solomon wrote, fell within the mild to moderate range. (Id.) ALJ Solomon further wrote that, "significantly, [Dr. Chan] wrote that [Leung's] limitations have not lasted, nor can they be expected to last, at least 12 months, and he indicated that her condition is not likely to deteriorate if she is placed under stress, especially that of a job." (Id.) Dr. Chan continued that, while in the

past Leung's alcohol and drug abuse materially impacted her mental condition, she is now sober and is able to function as a result. (Id.) ALJ Solomon gave Dr. Chan's opinion "substantial weight, as it [was] from a long-term treating psychiatrist and [was] corroborated by the substantial evidence in the case record, which reveal[ed] that [Leung] ha[d] virtually no mental limitations if she remains abstinent from drugs and alcohol." (Id.) ALJ Solomon found, however, that Dr. Chan's opinion that Leung regularly would be expected to miss one to two days of work per month was "not credible" because Leung "has not been hospitalized since she has been sober . . . [,] no extended periods of decompensation have been noted since that time," and Dr. Chan "agreed that [Leung] is not likely to decompensate." (Id.)

ALJ Solomon next discussed Leung's treatment with Dr. Parellada, who "wrote that he has been [Leung's] psychiatrist since 2006 and confirmed her diagnoses of bipolar disorder, generalized anxiety disorder, attention deficit disorder, and cocaine dependence in remission." (R. 29.) ALJ Solomon wrote that, while Dr. Parellada opined that Leung's condition was stable, he stated that Leung is unable to work full time due to her poor impulse control, memory issues and irritability. (Id.) "Unlike Dr. Chan," ALJ Solomon wrote, "Dr. Parellada neglected to provide a medical source statement or otherwise specify the degree of limitations [Leung] would experience in each aspect of vocational adjustment." (Id.) ALJ Solomon gave Dr. Parellada's opinion "little weight, since [Leung] testified that she has been under the psychiatric care of Dr. Chan for the past four years," and "no treatment records from Dr. Parellada were submitted that would document any recent treatment of" Leung. (Id.)

ALJ Solomon lastly discussed the findings of state psychological consultant Dr. Kamin. (Id.) ALJ Solomon wrote that Dr. Kamin "noted that there was insufficient information to substantiate the presence of a psychiatric disabling disorder prior to the date last insured," and that

Leung's psychiatric limitations fell in the mild to moderate range. (Id.) Dr. Kamin, however, did not include any specific functional limitations. (Id.) ALJ Solomon gave Dr. Kamin's opinion "partial weight to the extent he found that [Leung] has some limitations; however, as no functional limitations were stated," ALJ Solomon could not give Dr. Kamin's opinion "any further weight." (Id.)

   After reviewing the opinion evidence, ALJ Solomon wrote that no treating source provided an opinion regarding Leung's physical limitations, and Leung "retain[ed] the ability to perform a wide range of activities of daily living, can travel by herself, and uses no assistive device." (R. 30.) ALJ Solomon additionally found that Leung's statements concerning her back pain were "not fully credible." (Id.) ALJ Solomon wrote that although Leung alleged a back problem for many years, "her claim for benefits was based on a psychiatric condition plus problems with her knees." (Id.; see R. 203.) Leung's lumbar spine MRI "showed no herniations, stenosis, or nerve root compression, and the cervical spine report noted mild central canal stenosis without nerve root compression." (R. 30.) ALJ Solomon accordingly concluded that, notwithstanding Leung's statements to the contrary, Leung retained the RFC to perform the demands of light work. (Id.)

   ALJ Solomon next determined that Leung was unable to perform any of her past relevant work, "all of which [were] skilled jobs," because of her impairments. (Id.) Given Leung's "age, education, work experience, and residual functional capacity," ALJ Solomon determined that "there are jobs that exist in significant numbers in the national economy that" Leung can perform. (R. 31.) ALJ Solomon noted that Leung is considered a younger individual, has a high school education, and is able to communicate in English. (Id.) ALJ Solomon relied on vocational expert Dr. Taitz's testimony that a person with Leung's characteristics and limitations could perform the light, unskilled positions of mail clerk, price marker and information clerk. (Id.; see pages 4-5

above.)  Accordingly, ALJ Solomon concluded that Leung "has not been under a disability, as defined in the Social Security Act, from June 30, 2008, through the [June 23, 2015] date of [his] decision."  (R. 32.)

## ANALYSIS

I.    **THE APPLICABLE LAW**

A.    **Definition Of Disability**

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[4/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[5]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[6]

### B.  Standard Of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[7] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the

---

[5]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[6]   See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[7]   See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[8/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74.[9/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de novo</u> review.'" <u>Jones</u> v. <u>Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).[10/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" <u>E.g.</u>, <u>Duvergel</u> v. <u>Apfel</u>, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Douglass</u> v. <u>Astrue</u>, 496 F. App'x 154, 156 (2d Cir. 2012); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101

---

[8/]    <u>See also</u>, <u>e.g.</u>, <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[9/]    <u>See also</u>, <u>e.g.</u>, <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 31; <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 184; <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 61; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46.

[10/]    <u>See also</u>, <u>e.g.</u>, <u>Campbell</u> v. <u>Astrue</u>, 465 F. App'x 4, 6 (2d Cir. 2012); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586.

(2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[11]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. <u>See</u>,

---

[11]     <u>Accord</u>, <u>e.g.</u>, <u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 774; <u>see also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[12]

C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[12]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[13]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).[14]

---

[13]   See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[14]   Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. See 20

(continued...)

## II.    APPLICATION OF THE FIVE STEP SEQUENCE

### A.    Leung Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Leung was engaged in substantial gainful activity after her application for benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  ALJ Solomon's conclusion that Leung did not engage in substantial gainful activity during the applicable time period (see page 18 above) is not disputed and benefits Leung.  (See generally Dkt. No. 11: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.    Leung Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Leung proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Solomon determined that Leung's severe impairments were lumbar and cervical degenerative disc disease with cervical radiculopathy, bilateral knee degenerative joint disease, a

---

[14/]    (...continued)
C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

history of asthma, obesity, a history of ADHD, a history of substance abuse, and bipolar disorder. (See page 18 above.) ALJ Solomon's findings regarding the step-two severity of these impairments benefit Leung. Accordingly, the Court proceeds to the third step of the five-part analysis.

### C. Leung Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Leung had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Solomon found that notwithstanding Leung's severe impairments, she did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," in particular Listing 12.04. (See page 18 above.) ALJ Solomon stated that he compared the record medical evidence to the Listing requirements, and found that Leung had not met the necessary criteria. (R. 22-23.) The Court reviews Leung's impairments and the Listing criteria.

### 1. Mental Impairments

With regard to mental impairments, the SSA "will find that [a claimant] ha[s] a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).[15/] To satisfy paragraph B under Listing 12.04, Leung

---

[15/]     The Listings cited in this section of the opinion are those in effect on June 23, 2015, the date
(continued...)

must show at least two of the following:

    1.  Marked restriction of activities of daily living; or

    2.  Marked difficulties in maintaining social functioning; or

    3.  Marked difficulties in maintaining concentration, persistence, or pace; or

    4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

To satisfy paragraph C under Listing 12.04, Leung must show:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

ALJ Solomon found that Leung had a mild restriction in her activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence and pace. (R. 22.) ALJ Solomon also found that Leung "experienced one to two episodes of decompensation requiring emergency room visits; however, these were not of extended duration and involved drinking and substance abuse." (Id.)

---

[15]/    (...continued)
of ALJ Solomon's decision.

Leung works eight hours per week, has a boyfriend of six months who she sees twice a week, is a drug and alcohol "recovery coach" and talks on the phone to those in need "[l]ike two or three times a day," attends a church discussion group every Tuesday, "spends time with her peers at various programs she attends, and also spends time with her mother and daughters" "almost every day," has no problem getting along with authority figures and has not lost a job because of problems getting along with others. (See pages 2-3 above.) Treating psychiatrist Dr. Chan opined that Leung had no or mild limitations in most categories of functioning, and moderate limitations in her ability to maintain concentration, pace and attention for at least two hours at a time, and perform complex, repetitive or varied tasks. (See pages 7-8 above.) Dr. Chan further opined that Leung's condition was not likely to deteriorate if she experienced job stress, and Leung could "function well if [she] remain[ed] sober." (See page 8 above.) Moreover, ALJ Solomon correctly noted that Leung's episodes of decompensation were triggered by her substance abuse, but Leung was "almost four years clean" at the time of the hearing and "has not been hospitalized since she has been sober." (See pages 2 n.1, 21 above.) ALJ Solomon's findings regarding the paragraph B and C criteria are supported by substantial evidence.

### 2.    Disorders Of The Spine

For a disorder of the spine to be considered severe it must result "in compromise of a nerve root (including the cauda equina) or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or

posture more than once every 2 hours; or

    C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.[16/]  The inability to ambulate effectively referenced in Listing 1.04(C) is defined as:

    Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).

    Leung testified that she is able to travel alone using public transportation, and did not require "the use of a cane or any other type of assistive device to help [her] walk."  (See page 2 above.)  Leung's treatment records at Hudson Spine and Pain Medicine from October 2, 2014 through May 20, 2015 state that Leung appeared well developed, in no acute distress, used no assistive devices, had no diminished sensation, had full motor strength in her upper and lower extremities bilaterally (with some exceptions) and intact reflexes, and had a negative straight leg raise test bilaterally.  (See pages 17-18 above.) Dr. Salon further found that there were "no objective findings to support the fact that [Leung] would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects."  (See page 15 above.)  Leung appeared in no acute distress with a normal gait, could walk on heels and toes without difficulty and fully squat, had

---

[16/]    Although ALJ Solomon only discussed Listing 12.04 regarding mental impairments (see R. 21-23), the Court finds that his failure to discuss the remaining relevant Listings was harmless as Leung clearly does not meet their criteria.

a normal stance, used no assistive devices, needed no help changing or getting on and off of the examination table, and was able to rise from her chair without difficulty. (Id.) Moreover, ALJ Solomon noted that Leung's lumbar spine MRI "showed no herniations, stenosis, or nerve root compression, and the cervical spine report noted mild central canal stenosis without nerve root compression." (See page 22 above.) Leung's spinal impairments accordingly do not meet the Listing criteria.

### 3. Major Dysfunction Of A Joint

Listing 1.02 outlines the conditions required to establish disorders of the joint. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. To constitute an Appendix 1 impairment, Leung's knee condition must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. "Inability to ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability

to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

Leung testified that she is able to travel alone using public transportation, and did not require "the use of a cane or any other type of assistive device to help [her] walk." (See page 2 above.) Leung also testified that she is able to care for her own personal needs, e.g., dress, bathe and groom herself on a daily basis, and does the laundry and cooks at home. (See page 3 above.) Leung made similar statements during her consultative examination with Dr. Salon during which she stated that she could "cook, clean, do laundry, shop, shower, bathe, and dress by herself." (See pages 14-15 above.) Dr. Salon further found that Leung appeared in no acute distress with a normal gait, could walk on heels and toes without difficulty and fully squat, had a normal stance, used no assistive devices, needed no help changing or getting on and off of the examination table, and was able to rise from her chair without difficulty. (See page 15 above.) Leung's treatment records at Hudson Spine and Pain Medicine from October 2, 2014 through May 20, 2015 state that Leung appeared well developed, in no acute distress, used no assistive devices, had no diminished sensation, had full motor strength in her upper and lower extremities bilaterally (with some exceptions) and intact reflexes, and had a negative straight leg raise test bilaterally. (See pages 17-18 above.) Leung's knee condition thus does not meet the Listing criteria.[17]

---

[17] The Court further notes that there is no evidence Leung's asthma resulted in her frequent hospitalization or otherwise was uncontrolled even with medication. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 3.00, 3.03. Moreover, considering the medical records, Leung's obesity did not "'increase the severity of [her] coexisting or related impairments to the extent
(continued...)

D. **ALJ Solomon's Credibility and RFC Determinations**

Before proceeding to step four, the Court will address ALJ Solomon's credibility and residual functional capacity ("RFC") determinations.

1. **Credibility Determination**

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted).[18/] In addition, "courts must

---

[17/] (...continued)
that the combination of the impairments meets the requirements of a listing.'" Macaulay v. Astrue, 262 F.R.D. 381, 388 (D. Vt. 2009); see also, e.g., Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 102 (S.D.N.Y. 2015) ("[O]besity is not in and of itself a disability, and an ALJ's failure to explicitly address a claimant's obesity does not warrant remand.' . . . [T]he ALJ's obligation to discuss the claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities." (quotations & citation omitted)).

[18/] See, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'"); Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-
(continued...)

show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[19/] Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186

---

[18/]    (...continued)
CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[19/]    Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

at *2 (July 2, 1996).[20/]   The regulations set out a two-step process for assessing a claimant's

statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R.

§§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p).

ALJ Solomon reviewed Leung's testimony and the record evidence.  (R. 23-30.)  ALJ

Solomon noted that Leung's benefits application was not based on alleged back pain, there was no

---

[20/]   In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's assertions about the work-preclusive nature of her symptoms.  See generally SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); see also, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR.").  SSR 16-3p, however, was not made retroactive and the Court therefore applies SSR 96-7p as the ruling in effect at the time of the ALJ's decision in this case.  See, e.g., Crampton v. Comm'r of Soc. Sec., No. 16-CV-0356, 2017 WL 2829515 at *6 n.3 (N.D.N.Y. June 29, 2017); Smith v. Colvin, No. 14-CV-1752, 2016 WL 1170910 at *7 n.3 (D. Conn. Mar. 23, 2016).  In any event, the substance of the two-step process for evaluating claimants' symptoms discussed herein was not modified by SSR 16-3p.  Accord SSR 16-3p, 2016 WL 1119029 at *3-4; see also, e.g., Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (citing SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms).  Rather, SSR 16-3p's updated guidance is a matter of emphasis: whereas SSR 96-7p "placed a stronger emphasis on the role of the adjudicator to make a 'finding about the credibility of the individual's statements about the symptom(s) and its functional effects' . . . S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and 'eliminate[s] the use of the term "credibility"' from sub-regulation policy."  Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

treating source opinion regarding her physical limitations, she "retain[ed] the ability to perform a wide range of activities of daily living, can travel by herself, and uses no assistive device," and the evidence as a whole supported an RFC for light work.  (See page 22 above.)

### i.  **Physical Impairments**

ALJ Solomon correctly found that Leung's hearing testimony did not support allegedly disabling back pain or physical impairments generally.  Leung testified that she is able to travel alone using public transportation, and did not require "the use of a cane or any other type of assistive device to help [her] walk."  (See page 2 above.)  Leung further testified that she is able to care for her own personal needs, e.g., dress, bathe and groom herself on a daily basis, and does the laundry and cooks at home.  (See page 3 above.)  Leung made similar statements during her consultative examination with Dr. Salon during which she stated that she could "cook, clean, do laundry, shop, shower, bathe, and dress by herself."  (See pages 14-15 above.)  Leung also testified that she works eight hours per week, and claimed she could not work full time because of her memory and anxiety issues, but did not reference her back pain or any other physical impairment. (See pages 2-3 above.)

Moreover, although Leung's treatment records at Hudson Spine and Pain Medicine generally document Leung's antalgic gait, back and neck tenderness, trigger points, limited cervical and lumbosacral range of motion, and pain with range of motion, ALJ Solomon noted that no treating physician provided an opinion regarding Leung's physical work limitations, and nearly eight months of her most recent treatment records showed normal findings.  (See page 22 above.) Specifically, Leung's records from October 2, 2014 through May 20, 2015 state that Leung appeared well developed, in no acute distress, used no assistive devices, had no diminished sensation, had full motor strength in her upper and lower extremities bilaterally (with some exceptions) and intact

reflexes, and had a negative straight leg raise test bilaterally. (See pages 17-18 above.) Leung also reported improvement in her pain and function following injections. (See pages 16-17 above.)

Dr. Salon further found that there were "no objective findings to support the fact that [Leung] would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects." (See page 15 above.) Leung appeared in no acute distress with a normal gait, could walk on heels and toes without difficulty and fully squat, had a normal stance, used no assistive devices, needed no help changing or getting on and off of the examination table, and was able to rise from her chair without difficulty. (Id.) ALJ Solomon considered Dr. Salon's consultative examination, despite giving it partial weight and acknowledging that Leung's condition had since worsened. (See pages 19-20 above.)

ALJ Solomon appropriately applied the two-part credibility test and supported his findings with substantial evidence in Leung's treatment records regarding her physical impairments. (R. 23-30.)

### ii.     Mental Impairments

ALJ Solomon also appropriately considered Leung's statements concerning her mental impairments. (R. 23-30.)[21] Leung testified that she "gets paranoid in large crowds of people

---

[21]     The Court notes that ALJ Solomon did not specifically state that he found Leung's statements regarding her mental impairments to be credible or not credible. (See R. 30.) Nonetheless, ALJ Solomon reviewed Leung's testimony and her statements throughout the medical records before determining that Leung retained the ability to perform light work under certain conditions to account for her mental limitations noted in the RFC. (R. 23-30.) In discounting the alleged severity of Leung's mental impairments during his review of the medical evidence, ALJ Solomon noted, for example, that Leung's "own description of her daily activities [was] actually greater than [Dr. Kushner's] assessment" and that Leung had "virtually no mental limitations if she remains abstinent from drugs and alcohol." (R. 27-28.) ALJ Solomon's thorough review of the record evidence, Leung's testimony and her statements to her various physicians, clearly indicates that he discredited Leung's claims,
(continued...)

and suffers from social anxiety." (See page 3 above.) Leung further stated in her function report and at the hearing before ALJ Solomon that she suffered from memory loss, confusion, and difficulty concentrating. (See pages 2-3 above.) Leung stated that she is unable to work full time because of her "[f]orgetfulness and sometime[s] [her] anxiety is just too high." (See page 3 above.)

However, Leung also stated that she works eight hours per week, has a boyfriend of six months who she sees twice a week, is a drug and alcohol "recovery coach" and talks on the phone to those in need "[l]ike two or three times a day," attends a church discussion group every Tuesday, "spends time with her peers at various programs she attends, and also spends time with her mother and daughters" "almost every day," has no problem getting along with authority figures and has not lost a job because of problems getting along with others. (See pages 2-3 above.) These activities of daily living belie any allegedly disabling psychiatric issues.

Moreover, although ALJ Solomon noted that Leung was hospitalized multiple times in 2011 for a suicide attempt, drug overdoses, bipolar disorder, a manic episode and cocaine dependance, she was "almost four years clean" at the time of the hearing and "has not been hospitalized since she has been sober." (See pages 2 n.1, 6, 19, 21 above.) ALJ Solomon also heavily relied on treating psychiatrist Dr. Chan's opinion that Leung had no or mild limitations in most categories of functioning, and moderate limitations in her ability to maintain concentration,

---

[21/] (...continued)
despite not using the (often boilerplate) language regarding a claimant's credibility. See, e.g., Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."); Phelps v. Colvin, 20 F. Supp. 3d 392, 404 (W.D.N.Y. 2014) ("Although the ALJ did not expressly state the weight she did or did not give to Ms. Matthews' testimony . . . , the ALJ did discuss the testimony in such a way as to make it clear to a reviewer of the decision that she discredited Ms. Matthews' opinion.").

pace and attention for at least two hours at a time, and perform complex, repetitive or varied tasks. (See pages 7-8 above.) Dr. Chan further opined that Leung's condition was not likely to deteriorate if she experienced job stress, Leung had not sustained any permanent damage due to her drug use, which was no longer a factor in her mental condition given her sobriety, and there were no specific medication side effects that would impact Leung's ability to work. (See page 8 above.) Importantly, Dr. Chan concluded that Leung's limitations had not lasted, nor could they be expected to last, twelve consecutive months or longer, and Leung could "function well if [she] remain[ed] sober." (Id.) This report post-dates Dr. Kushner's consultative opinion in which he opined that Leung had a moderate to marked limitations in multiple categories of functioning, and undercuts Leung's statements regarding the severity of her mental impairments. (See pages 10-12 above.)

The Court accordingly finds that ALJ Solomon's credibility determination as to Leung's psychiatric impairments was supported by substantial evidence.

## 2. Residual Functional Capacity Determination

ALJ Solomon determined that Leung had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she

> must avoid concentrated exposure to environmental irritants; must avoid climbing ropes, ladders, or scaffolds; avoid working at unprotected heights or with hazardous machinery; can understand, remember and carry out simple instructions, make simple work-related decisions, maintain attention and concentration for rote work, maintain a regular schedule, and can perform a job defined as one with only simple decisionmaking and not requiring high volume, fast-paced assembly line production quotas.

(R. 23.) Light work involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work,

you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

Substantial evidence in Leung's treatment records supports an RFC for light work with the above accommodations.  As detailed above, Leung retained the ability to perform a wide array of activities of daily living despite her impairments, was able to travel alone using public transportation and did not require "the use of a cane or any other type of assistive device to help [her] walk."  (See page 2 above.)  Moreover, despite presenting with an antalgic gait, tenderness, trigger points and limited range of motion during her visits at Hudson Spine and Pain Medicine, nearly eight months of Leung's most recent treatment records show a number of normal findings.  (See pages 17-18 above.)  In particular, Leung's records from October 2, 2014 through May 20, 2015 state that Leung appeared well developed, in no acute distress, used no assistive devices, had no diminished sensation, had full motor strength in her upper and lower extremities bilaterally (with some exceptions) and intact reflexes, and had a negative straight leg raise test bilaterally.  (Id.) Leung also reported improvement in her pain and function following injections.  (See pages 16-17 above.)

Dr. Salon further found that there were "no objective findings to support the fact that [Leung] would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects."  (See page 15 above.)  Leung appeared in no acute distress with a normal gait, could walk on heels and toes without difficulty and fully squat, had a normal stance, used no assistive devices, needed no help changing or getting on and off of the examination table, and was able to rise from her chair without difficulty.  (Id.)  ALJ Solomon considered Dr. Salon's consultative examination, despite giving it partial weight and acknowledging that Leung's condition had since worsened.  (See pages 19-20 above.)

ALJ Solomon additionally noted that Leung's records with other physicians document normal physical findings. (R. 24-29.) On April 5, 2013, Dr. Shum wrote that Leung was well-developed and in no apparent distress, her neck was supple with good range of motion, there was normal tone, bulk and "5/5" power in all of her extremities, normal gait, and her heel/toe walk was normal. (See pages 8-9 above.) On March 7, 2014, Dr. Shum stated that Leung was well-developed, in no apparent distress, her neck was supple with a mild restriction in range of motion, she had no tenderness to palpation in her cervical paraspinals, strength was "5/5" in the upper extremities, and her fine finger movements and gait were normal. (See page 15 above.) On March 11, 2015, Dr. Cheng noted that Leung's strength was "5/5" throughout, and her muscle tone, sensory examination, fine movements, coordination and gait were normal. (See page 12 above.) These records and Leung's testimony provide substantial evidence in support of ALJ Solomon's determination that Leung retains the ability to perform light work despite her physical impairments.[22]

---

[22] The Court reaches this conclusion even though ALJ Solomon noted that no treating physician provided an opinion regarding Leung's physical work limitations. (See page 22 above.) In light of the ALJ's duty to develop the record, generally an "ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced." Santiago v. Comm'r of Soc. Sec., 13 Civ. 3951, 2014 WL 3819304 at *17 (S.D.N.Y. Aug. 4, 2014) (Swain, D.J.). "That said, the Second Circuit has clarified that remand is not always required when an ALJ fails in his duty to request opinions, particularly where the record contains sufficient evidence from which an ALJ can assess [claimant's] residual functional capacity." Paredes v. Comm'r of Soc. Sec., 16 Civ. 0810, 2017 WL 2210865 at *18 (S.D.N.Y. May 19, 2017) (quotations omitted); see also, e.g., Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8-9 (2d Cir. 2017) ("Because the ALJ reached her RFC determination based on Dr. Wolkoff's contemporaneous treatment notes—while at the same time rejecting his post hoc medical opinion ostensibly based on the observations memorialized in those notes—that determination was adequately supported by more than a mere scintilla of evidence. . . . [B]ecause the ALJ based its RFC determination on Dr. Wolkoff's years' worth of treatment notes, it was not necessary for the ALJ to seek additional medical information regarding [the
(continued...)

ALJ Solomon also properly accounted for Leung's psychiatric impairments in reaching his RFC determination. As noted above, while Leung was hospitalized in 2011 for several issues including drug dependence, she has not been hospitalized since she became sober several years ago. (See pages 6, 21 above.) Leung also stated that she works eight hours per week, has a boyfriend of six months who she sees twice a week, is a drug and alcohol "recovery coach" and talks on the phone to those in need "[l]ike two or three times a day," attends a church discussion group every Tuesday, "spends time with her peers at various programs she attends, and also spends time

---

[22]/     (...continued)
claimant's] RFC."); Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) ("The ALJ in this case based his findings on the psychiatric evaluation of a consultative psychologist who personally examined [the claimant] as well as [the claimant's] complete medical history and treatment notes, which themselves contained multiple psychological assessments of [the claimant]. Although the Social Security regulations express a clear preference for evidence from the claimant's own treating physicians over the opinion rendered by a consultative examiner, this Court does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination. Given the extensive medical record before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from one of [the claimant's] treating physicians regarding the extent of [the claimant's] impairments in the functional domain of caring for oneself."); Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013) (The claimant "first asserts that the ALJ committed error in assessing her RFC by failing to seek an opinion from her treating physicians as to whether [the claimant] could meet the physical demands of work. . . . The medical record in this case is quite extensive. Indeed, although it does not contain formal opinions on [the claimant's] RFC from her treating physicians, it does include an assessment of [the claimant's] limitations from a treating physician, Dr. Gerwig. Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity."). Here, the record is voluminous and contains records from a number of physicians, including the numerous records from Hudson Spine and Pain Medicine that document some of Leung's most recent treatment. The record also contains a functional assessment from Dr. Salon of Leung's ability to sit, stand, climb, push, pull and carry heavy objects that ALJ Solomon considered. (See page 15 above.) The Court accordingly finds that the error (if any) in failing to seek an opinion from Leung's treating physician was harmless.

with her mother and daughters" "almost every day," has no problem getting along with authority figures and has not lost a job because of problems getting along with others. (See pages 2-3 above.)

ALJ Solomon properly gave Dr. Chan's opinion "substantial weight, as it [was] from a long-term treating psychiatrist and [was] corroborated by the substantial evidence in the case record, which reveal[ed] that [Leung] ha[d] virtually no mental limitations if she remains abstinent from drugs and alcohol." (See page 21 above.)[23] Dr. Chan opined that Leung had no or mild limitations in most categories of functioning, and moderate limitations in her ability to maintain concentration, pace and attention for at least two hours at a time, and perform complex, repetitive or varied tasks. (See pages 7-8 above.) Dr. Chan further opined that Leung's condition was not likely to deteriorate if she experienced job stress, Leung had not sustained any permanent damage due to her drug use, which was no longer a factor in her mental condition given her sobriety, and there were no specific medication side effects that would impact Leung's ability to work. (See page

---

[23]    The Court notes that, on April 21, 2015, Dr. Alejo Parellada wrote a "To Whom It May Concern" letter stating that he had been Leung's treating psychiatrist since 2006 and that Leung was "unable to keep a full time competitive job" due to her "poor impulse control, memory problems and irritability." (See page 12 above.) However, "[u]nlike Dr. Chan," ALJ Solomon wrote, "Dr. Parellada neglected to provide a medical source statement or otherwise specify the degree of limitations [Leung] would experience in each aspect of vocational adjustment." (See page 21 above.) ALJ Solomon gave Dr. Parellada's opinion "little weight, since [Leung] testified that she has been under the psychiatric care of Dr. Chan for the past four years," and "no treatment records from Dr. Parellada were submitted that would document any recent treatment of" Leung. (Id.) An ALJ has a duty to develop the record in certain circumstances; however, "'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" Swiantek v. Comm'r of Soc. Sec., 588 F. App'x at 84. Here, ALJ Solomon possessed a complete medical history with no obvious gaps that included nearly one hundred treatment notes from Dr. Chan since 2011, and his mental medical source questionnaire. (See pages 6-8 above.) The Court also notes that the hearing testimony appears to indicate that Dr. Chan is Leung's current, and seemingly only, psychiatric provider. (See R. 67-68; Dkt. No. 11: Comm'r Br. at 23.)

8 above.) Importantly, Dr. Chan concluded that Leung's limitations had not lasted, nor could they be expected to last, twelve consecutive months or longer, and Leung could "function well if [she] remain[ed] sober." (Id.)

ALJ Solomon further gave good reasons for discounting Dr. Chan's opinion that Leung would be absent from work up to two days per month, because Leung "has not been hospitalized since she has been sober . . . [,] no extended periods of decompensation have been noted since that time," and Dr. Chan "agreed that [Leung] is not likely to decompensate." (See page 21 above.) Moreover, Dr. Chan's opinion and Leung's various activities of daily living supported ALJ Solomon's decision to give Dr. Kushner's opinion "little weight, as [Leung's] own description of her daily activities [wa]s actually greater than this assessment and [Leung's] long-term treating doctor [found] few limitations." (See page 20 above.)

ALJ Solomon gave Dr. Palmese's opinion "partial weight, as she [was] a one-time consultant." (See page 19 above.) Dr. Palmese wrote that Leung "would likely succeed in a position in a relatively slow-paced environment that offers rote and potentially hands-on learning with limited multi-tasking and rapid decision-making requirements," and that Leung's "cognitive weaknesses alone would not render her wholly unable to work." (See page 10 above.) ALJ Solomon accounted for the limitations Dr. Palmese identified by limiting Leung to understanding and carrying out simple instructions, making simple work-related decisions, maintaining concentration and attention for rote work, and stated Leung "can perform a job defined as one with only simple decisionmaking and not requiring high volume, fast-paced assembly line production quotas" (see pages 18-19 above), "although [Leung's] long-term treating psychiatrist [Dr. Chan] opine[d] minimal limitations" (see page 19 above). In doing so, ALJ Solomon also adequately accounted for the moderate limitations found by Dr. Chan.

ALJ Solomon supported his RFC determination with substantial evidence in Leung's treatment records.

**E.     Leung Did Not Have The Ability to Perform Her Past Relevant Work**

The fourth step of the five-step analysis asks whether Leung had the residual functional capacity to perform her past relevant work.  (See page 26 above.)  Leung previously worked as an office manager assistant, grant specialist, an administrative assistant and "rate retention specialist," "all of which [were] skilled jobs."  (See pages 2, 22 above.)  ALJ Solomon concluded that Leung did not have the ability to perform her past relevant work.  (See page 22 above.)  Because this finding favors Leung, the Court proceeds to the fifth and final step of the analysis.

**F.     There Are Jobs In Substantial Numbers In The Economy That Leung Can Perform**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[24/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether

---

[24/]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids

is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Solomon properly relied on the testimony of vocational expert Dr. Taitz, who testified that a person with Leung's RFC could not perform her past work, but could perform the jobs of mail clerk, price marker and information clerk.  (<u>See</u> pages 4-5 above.)  These jobs are light, unskilled positions, and Dr. Taitz testified that they all exist in significant numbers in the national economy.  (<u>See</u> page 5 above.)  ALJ Solomon relied upon Dr. Taitz's testimony in reaching his step five determination when he specifically referred to those jobs in his findings.  (<u>See</u> page 22 above.) Accordingly, ALJ Solomon's decision at step five was supported by substantial evidence.  <u>See</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Berryhill</u>, 16 Civ. 8752, 2017 WL 3701220 at *20 (S.D.N.Y. Aug. 28, 2017) (Peck, M.J.).

## CONCLUSION[25/]

For the reasons set forth above, the Commissioner's determination that Leung was not disabled within the meaning of the Social Security Act during the period from June 30, 2008 through June 23, 2015 is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. Nos. 11 & 15) should be <u>GRANTED</u>.

---

[25/]  If Leung requires copies of any of the cases reported only in Westlaw, she should request copies from defense counsel.  <u>See</u> <u>Lebron</u> v. <u>Sanders</u>, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 1640, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Swain (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       November 30, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:  All Counsel
              Ms. Leung (mail)